**Horton J. BROWN, Individually, as Assignee of Ray Browder, and d/b/a Western Electrical & Mechanical Systems, B & B Construction Co., and Puget Sound Builders**

v.

**The UNITED STATES.**

No. 251–72.

United States Court of Claims.

Oct. 22, 1975.

As Amended Jan. 9, 1976.

---

16. *McNamara Construction of Manitoba, Ltd. v. United States, supra,* 509 F.2d at 1171, 206 Ct.Cl. at 10.

Arnold B. Robbins, Seattle, Wash., attorney of record for plaintiffs.

Howard G. Slavit and Carolyn B. Lamm, Washington, D. C., with whom was Acting Asst. Atty. Gen. Irving Jaffe, for defendant.

Before COWEN, Chief Judge, MARKEY,[*] Chief Judge, and LARAMORE, Senior Judge.

## ON DEFENDANT'S MOTION FOR PARTIAL SUMMARY JUDGMENT

COWEN, Chief Judge.

This case, which arises out of plaintiff's involvement in a housing rehabilitation program conducted by the Department of Housing and Urban Development (HUD), comes before the court on defendant's motion for partial summary judgment as to plaintiff's petition and for summary judgment as to its own counterclaim.[1]

The facts in this case are not complicated. The Government, through HUD, owned during the relevant time period various properties which it had acquired through foreclosures and sales. As one would readily expect, these properties were often in dire need of repairs. To facilitate the quick disposition of the properties to private buyers, HUD entered into "Area Management Broker" (AMB) contracts with local real estate brokers, who then became agents of HUD in the repair and subsequent sale of the properties. For the repair and sale of certain of the properties in the Seattle, Washington, area, HUD entered into an AMB contract with Emil C. Gislason, d/b/a Berg Realty Company. Working for Mr. Gislason in this enterprise were Roy H. Christopherson and George J. Manus, both of whom play feature roles in the activities which form the basis of this litigation.

The AMB contract and the procedures used in carrying it out were governed by various HUD regulations and policies. The applicable regulations required Berg Realty Company to solicit at least three competitive bids for various jobs which were necessary for the renovation of the properties in question.[2] These tasks were classified separately according to the different craft skills that were required to complete them. No matter how many bids were received by the AMB, the applicable HUD policies prohibited any contractor from receiving more than one craft job on each FHA property. Pursuant to the language of the AMB contract, Berg Realty Company was authorized to "procure * * * such supplies, materials, equipment, and services * * * as may be necessary for the maintenance, repair, and operation of the project where the cost of a single item or total cost of a series of related items * * * does not exceed $2,500.00."[3] It was also the responsibility of the AMB, in this case Berg Realty Company, to accept and compile the various bids, complete certain portions of each purchase order, and then to forward the material to HUD's local office for further processing. After this processing was completed, several copies of the purchase orders were returned to the AMB in part so that its employees could certify the completion of the work by the private contractor.

---

[*] Chief Judge of the United States Court of Customs and Patent Appeals, sitting by designation pursuant to 28 U.S.C. § 293(a).

1. In an effort to clarify an otherwise very confusing situation, defendant's post-argument brief requests the court "not [to] consider the final three contracts listed in claim 1 [sic] of plaintiff's petition (FHA No. 561–177215–203, P.O. 9829; FHA No. 561–206005–203, P.O. unlisted; and FHA No. 561–106587–203, P.O. 9871) to be a part of said motion." It appears that defendant's work product was "a committee effort," and we feel sure that the confusion resulted from the difficulties inherent in this method of production rather than a lack of care by the individuals involved.

2. In this regard, Chapter 3 of HUD's Property Disposition Handbook states the following:

"Competition on small purchase transactions may be limited to three contractors or suppliers in the local trade area. Additional competition may be solicited if necessary to assure reasonable prices, and competition outside of the trade area should be solicited when necessary to accomplish that objective."

3. In actual practice, the ceiling was somewhat lower. According to Chapter 8 of HUD's Property Disposition Handbook, "The broker is not authorized and shall not make purchases when the cost of a single item or total cost of a series of related items exceeds $2,000. * * *"

During this time, plaintiff, Horton J. Brown, was a general contractor doing business in the State of Washington. Between the latter part of 1970 and the spring of 1972, he worked on various properties in the Seattle area covered by HUD's AMB contract with Berg Realty Company. According to defendant, Mr. Brown entered into a conspiracy with various individuals to circumvent the regulations and policies discussed above. To ensure that he received every bid on the various properties involved in this renovation program, Mr. Brown allegedly made arrangements to receive all the invitations to bid for each item open for bid. In this manner, he could rig the bidding in such a way that he would always emerge the winner of the contract in question. In order to lend some semblance of propriety to this activity, Mr. Brown allegedly created the following "companies" solely for bidding purposes: B & B Construction Company, Horton Brown, Western Company, Horton J. Brown & Associates, Ray Browder, and Western Electrical & Mechanical System. According to defendant, Mr. Brown engaged in this activity with full knowledge that his actions would prevent the requisite competition from other legitimate contractors.

An essential part of the factual background of this case concerns the events which occurred when plaintiff's alleged "system" was uncovered during a lengthy investigation by the Federal Bureau of Investigation. Subsequent to the completion of this investigation, an indictment was filed by a grand jury formed in the Western District of Washington against plaintiff, Messrs. Browder, Gislason, Christopherson, and Manus. Plaintiff was named in 17 counts of the indictment, dated August 15, 1972, alleging various violations of Title 18, Section 1001 of the United States Code.[4] He was also named along with the other principals in the case in a conspiracy count based on Title 18, Section 371 of the United States Code.[5] The indictment covered some, but clearly not all, of the contracts between plaintiff and HUD. By the time the indictment was filed, HUD had approved many purchase orders in the names of plaintiff's various companies, and several of plaintiff's claims for payment had been paid by defendant in the normal course of business. However, when the local office of HUD learned of the FBI investigation and the indictment, it directed that no further payments be transferred to plaintiff pending the final outcome of the criminal proceedings.

On November 24, 1972, after a trial in which plaintiff testified, a jury found Mr. Brown guilty as charged on all 18 counts in which he was named in the indictment. Plaintiff was fined $5,000, sentenced to six months in jail, and placed on probation for two-and-a-half years. His conviction was affirmed by the Ninth Circuit Court of Appeals on August 17, 1973.

On June 16, 1972, plaintiff, in his own right and as the alleged assignee of Ray Browder, filed his petition in this court, making numerous breach of contract claims and requesting damages totalling $64,794. On February 26, 1973, the Government commenced a civil action in the United States District Court for the Western District of Washington under

**4.** 18 U.S.C. § 1001 states that:

"Whoever, in any matter within the jurisdiction of any department or agency of the United States knowingly and willfully falsifies, conceals or covers up by any trick, scheme, or device a material fact, or makes any false, fictitious or fraudulent statements or representations, or makes or uses any false writing or document knowing the same to contain any false, fictitious or fraudulent statement or entry, shall be fined not more than $10,000 or imprisoned not more than five years, or both."

**5.** 18 U.S.C. § 371 states in pertinent part:

"If two or more persons conspire either to commit any offense against the United States, or to defraud the United States, or any agency thereof in any manner or for any purpose, and *one or more of such persons do any act to* effect the object of the conspiracy, each shall be fined not more than $10,000 or imprisoned not more than five years, or both."

the False Claims Act, 31 U.S.C. § 231-35, against plaintiff, Ray Browder, and the officials of the Berg Realty Company involved in the criminal proceedings. Defendant, on February 28, 1973, filed a motion in this court to stay the proceedings here pending the outcome of the District Court litigation. However, before a decision from this court could be made, the District Court, on motion from Mr. Brown, ordered that all proceedings in that forum as to Mr. Brown be stayed pending further order of that court. On May 15, 1973, a trial judge of our trial division denied defendant's motion to stay proceedings. His ruling was based in part on the fact that plaintiff had filed his suit here prior to the time defendant filed its complaint in the District Court.

I

*Assignment of Claims*

Our first task in this case is to determine precisely which claims found in plaintiff's petition are properly before the court. Paragraph three of plaintiff's petition states that "all rights of Ray Browder to payment or awards under any of the contracts or bids hereinbelow described have been assigned to plaintiff." [6] In determining whether these alleged assignments are valid, we look first to the Assignment of Claims Act, 31 U.S.C. § 203, 41 U.S.C. § 15, which sets forth in detail all the procedures which are required. The Act states in part that:

All * * * assignments * * * of any claim upon the United States * * * shall be absolutely null and void, unless they are freely made and executed in the presence of at least two attesting witnesses, after the al-

lowance of such a claim, the ascertainment of the amount due, and the issuing of a warrant for the payment thereof. [31 U.S.C. § 203]

No contract or order, or any interest therein, shall be transferred by the party to whom such contract or order is given to any other party, and any such transfer shall cause the annulment of the contract or order transferred, so far as the United States are concerned. [41 U.S.C. § 15]

The Act, which is clearly applicable to the situation presently before the court, does contain exceptions to the general provisions cited above, to authorize assignments to "a bank trust company, or other financing institution, including any Federal lending agency." 31 U.S.C. § 203, 41 U.S.C. § 15.

At no place in his submissions to this court does plaintiff allege that he has complied with the Assignment of Claims Act. Indeed, plaintiff freely admits that at least a portion of the Act was not followed. *See Plaintiff's Brief in Opposition to Defendant's Motion for Summary Judgment*, at 3. This concession would seem to preclude the validity of the alleged assignments by Ray Browder to plaintiff. *See Uniroyal, Inc. v. United States*, 454 F.2d 1394, 1396, 197 Ct.Cl. 258, 260–61 (1972); *Beaconwear Clothing Co. v. United States*, 355 F.2d 583, 589–90, 174 Ct.Cl. 40, 49–51 (1966); *Royal Indemnity Co. v. United States*, 93 F.Supp. 891, 894, 117 Ct.Cl. 736, 746 (1950). In any event, since plaintiff clearly does not fall within the "financing institution" exception cited above and has not demonstrated compliance with the procedures mandated by this Act, the purported assignments are invalid, and we hold that plaintiff may not

---

**6.** After a careful review of the evidence now in the record, we find that the following successful bids were placed in the name of Ray Browder: FHA No. 561–187323–221 (P.O. No. 10270); FHA No. 561–191409–203 (P.O. No. 10163); FHA No. 561–167731–221 (P.O. No. 10299); FHA No. 561–148884–203 (P.O. No. 10167). Defendant also claims that FHA No. 561–157591–203b2 ($1,983) was submitted in

the name of Mr. Browder. However, since defendant's exhibits do not contain a copy of the specific Invitation to Bid signed by Mr. Browder, we have decided to leave this last contract off the list. No change in the final results should occur, though, in view of our decision as to plaintiff's claim three, discussed later in this opinion.

recover on any of the Browder claims assigned to plaintiff.

## II

### Plaintiff's Claims 1 and 2

Plaintiff's first substantive claim, labeled as "Express Contract," seeks recovery on 20 purchase orders which plaintiff allegedly submitted to defendant for payment and which were never paid. His second claim alleges that, although certain work was substantially completed, several purchase orders were not submitted to defendant, because of defendant's prior repudiation of the relevant contracts. These two claims will be treated together here because defendant's counter-argument applies to both claims collectively. Defendant contends that, based upon plaintiff's fraudulent activity and pursuant to applicable case law, HUD possessed the power to cancel *all* of the contracts listed in these claims. Therefore, according to defendant, no payments were due on these purchase orders and these claims should be dismissed.

If defendant is to win on its "cancellation" argument, it must demonstrate that plaintiff's activity as to each and every contract was fraudulent. *See United States v. Acme Process Equip. Co.*, 385 U.S. 138, 87 S.Ct. 350, 17 L.Ed.2d 249 (1966). Defendant's blanket assertion in this regard falls far short of a showing by undisputed facts that plaintiff obtained each of the contracts included in his claims 1 and 2 knowingly by false and fraudulent representations. Indeed, plaintiff denies that any such conduct existed as to *any* of these contracts. In an affidavit accompanying his brief to the court, Mr. Brown states that:

> At no time did I obtain nor have I attempted to obtain any remuneration or other consideration from the United States except for full and fair value

rendered or to be rendered by me to the United States. Consequently, I deny that I have knowingly and intentionally practiced or attempted to practice fraud against the United States in the proof, statement, establishment or allowance of any of the claims set forth in my Petition.

In order to prevail on its motion for summary judgment, in which defendant contends that no material fact remains in dispute, defendant must demonstrate that plaintiff's affidavit cited above does not create an issue of fact that forces the entire "cancellation" question to trial. In other words, defendant must show the court why plaintiff is estopped from claiming that his prior activity in obtaining these contracts was entirely correct and "above-board."

Defendant's "estoppel" argument is based primarily on plaintiff's conviction of violating 18 U.S.C. § 1001 and 18 U.S.C. § 371. According to defendant, "[b]y virtue of the doctrine of collateral estoppel, plaintiff is estopped to deny any question of fact distinctly put in issue and directly determined by the district court as a ground for his conviction in the antecedent criminal action." *Defendant's Post-Argument Statement*, at 4–5. Defendant's argument follows that plaintiff is debarred from now asserting the lack of fraud in his prior bidding activities and cannot create a dispute of fact with respect to defendant's "cancellation" argument.

We agree with defendant's reasoning as it relates to those purchase orders in claims 1 and 2 of plaintiff's petition that also formed the basis of plaintiff's conviction.[7] It has been well established that prior criminal conviction may work an estoppel in a subsequent civil proceeding. *See Local 167, Int'l Bhd. of Teamsters v. United States*, 291 U.S. 293, 298, 54 S.Ct. 396, 78 L.Ed. 804 (1934); *Armstrong v. United States*, 354 F.2d 274, 290–91, 173 Ct.Cl. 944, 968

---

7. Those purchase orders listed both in plaintiff's petition (claims 1 and 2) and in the earlier indictment are as follows: FHA No. 561- 148884–203 (P.O. Nos. 10167, 10510, 10169, 10168); FHA No. 561–191409–203 (P.O. No. 10163).

(1965). Therefore, for those purchase orders listed in plaintiff's indictment and conviction, the question becomes simply whether cancellation is an appropriate sanction for contract activity violating 18 U.S.C. § 1001.

We are aided in this determination by several of the cases cited to us by defendant, especially *United States v. Acme Process Equip. Co.*, 385 U.S. 138, 87 S.Ct. 350, 17 L.Ed.2d 249 (1966). In *Acme* the Supreme Court was presented with the question whether the Government could legally cancel contracts found to have been obtained in a fraudulent manner pursuant to the Anti-Kickback Statute, 41 U.S.C. § 51 (1970).[8] Although this Act contained express provisions for civil sanctions against anyone found guilty of fraudulent activity, the Supreme Court found that "[t]here [was] absolutely no indication in the legislative history of the * * * Act that Congress, in providing a civil remedy for a more tangible evil, intended to preclude other civil sanctions necessary to effectuate the purpose of the Act." 385 U.S. at 145, 87 S.Ct. at 355. *See also United States v. Mississippi Valley Generating Co.*, 364 U.S. 520, 563, 81 S.Ct. 294, 5 L.Ed.2d 268 (1961). Similarly, in the situation presently before this court we have been cited to no authority which indicates that Congress did not intend to permit cancellation as an alternative remedy for contracts fraudulently obtained under 18 U.S.C. § 1001. Indeed, in studying the many pronouncements in prior cases regarding the purpose of this statute, it becomes very clear that cancellation for those contracts proven to be "tainted" is in order. *See United States v. Bedore*, 455 F.2d 1109, 1111 (9th Cir. 1972); *Stein v. United States*, 363 F.2d 587 (5th Cir.), *cert. denied*, 385 U.S. 934, 87 S.Ct. 294, 17 L.Ed.2d 214 (1966); *United States v.*

*Johnson*, 284 F.Supp. 273, 278 (W.D.Mo. 1968), *aff'd* 410 F.2d 38 (8th Cir.), *cert. denied*, 396 U.S. 822, 90 S.Ct. 63, 24 L.Ed.2d 72 (1969). Therefore, we conclude: (1) plaintiff is estopped from denying his fraudulent activity as to those contracts forming the basis for his conviction of violating 18 U.S.C. § 1001, and (2) defendant has the legal right to cancel contracts found to have been obtained in violation of 18 U.S.C. § 1001. From these conclusions it follows that, despite Mr. Brown's affidavit, defendant prevails in its motion for summary judgment as to those portions of plaintiff's claims 1 and 2 which were specifically included in plaintiff's criminal indictment and conviction.

However, we cannot grant defendant's motion for summary judgment as it relates to the remaining purchase orders included in plaintiff's first two claims. In its reply brief, defendant states that "upon examination of the other documents in [Exhibits] 12, 15 and 17, the Court will be thoroughly convinced that all of the items in [Claims 1 and 2] reek of fraud * * *" *Defendant's Reply Brief*, at 21. However, collateral estoppel does not apply to those purchase orders which did not form the basis of plaintiff's conviction. As the Supreme Court stated in *Emich Motors Corp. v. General Motors Corp.*, 340 U.S. 558, 569, 71 S.Ct. 408, 414, 95 L.Ed. 534 (1951):

> Such estoppel extends only to questions "distinctly put in issue and directly determined" in the criminal prosecution. In the case of a criminal conviction based on a jury verdict of guilty, issues which were essential to the verdict must be regarded as having been determined by the judgment. [citations omitted]

No matter how broad we might believe to be the scope of the conspiracy in which plaintiff was involved, the crimi-

---

**8.** Actually, the defendants in Acme had never been found guilty of the crimes outlined in the original Anti-Kickback Act, 60 Stat. 37. However, in 1960 Congress amended the civil provisions of the Act to cover the type of contracts involved in defendant's situation. 74 Stat. 740. This amended provision was made retroactive to permit the Government to recover kickbacks "whether heretofore or hereafter paid or incurred. * * *."

nal conviction can be utilized to estop plaintiff only as to the fraudulent acts for which he was convicted.[9] Therefore, we must recognize plaintiff's affidavit as creating an issue of fact as to the remaining purchase orders and remand this portion of plaintiff's claims 1 and 2 for trial.[10]

### III

### *Plaintiff's Claim 3*

■ In his third claim plaintiff seeks recovery of $8,748 for emergency work which he allegedly performed pursuant to oral instructions from one of defendant's agents. Defendant counters that even if these instructions were given, plaintiff's claim should fail, since the instructions were completely unauthorized. After a review of the record before us, we conclude that defendant's motion for summary judgment should be granted as to plaintiff's claim 3.

Defendant's argument is supported by settled principles of law. In a previous decision involving substantially similar actions of HUD officials, the court stated:

It is evident that neither of these HUD officials was a contracting officer nor authorized to commit defendant to any financial obligations of a contractual nature directly with private parties. The United States is not bound by the unauthorized acts of its agents. Here, assuming that plaintiff's recollection of events is correct,

[plaintiff] has not shown that [the agents] acted within their authority. It is plaintiff's responsibility to make such a showing and plaintiff is deemed to have notice of their limited authority. *Federal Crop Ins. Corp. v. Merrill,* 332 U.S. 380, 384, 68 S.Ct. 1, 92 L.Ed. 10 (1947); *National Bank of N. America v. United States,* 456 F.2d 754, 197 Ct.Cl. 948 (1972); *California-Pac. Util. Co. v. United States,* 194 Ct.Cl. 703 (1971); *Fountain v. United States,* 427 F.2d 759, 192 Ct.Cl. 495 (1970), *cert. denied,* 404 U.S. 839, 92 S.Ct. 131, 30 L.Ed.2d 73 (1971); *Miami Metropolitan Bldg. Corp. v. United States,* 180 Ct.Cl. 503 (1967).

*Housing Corp. of America v. United States,* 468 F.2d 922, 925, 199 Ct.Cl. 705, 711–12 (1972); *See Putnam Mills Corp. v. United States,* 479 F.2d 1334, 202 Ct.Cl. 1 (1973).[11]

Therefore, the primary question is whether the evidence presented to the court demonstrates that the alleged instructions, if given, were "authorized" by defendant. From the record, we have determined that such instructions as described in plaintiff's third claim would clearly have been unauthorized and therefore that plaintiff's claim must fail. First, such an instruction would have been in direct contravention of the AMB contract between HUD and Berg Realty Company, which authorized the latter to procure supplies, equipment and services only if their cost did not exceed $2,500. The purchase orders involved in this

9. Defendant also argues that the court should recognize collateral estoppel as affecting all of the purchase orders in these claims because "the United States Attorney might have elected to prosecute the plaintiff on all of the contracts listed in his petition but instead chose to indict him on only 18 counts." This argument is not persuasive, since one can make the equally forceful counter-argument that any omissions by the prosecutor resulted from either weak or non-existent proof of plaintiff's fraudulent activity.

10. Our rationale extends also to defendant's alternative argument for cancellation, found in its reply brief, which claims that plaintiff "successfully obtained those contracts listed in pe-

tition Claims 1 and 2 by circumventing and violating the applicable HUD regulations." *Defendant's Reply Brief,* at 8 (footnote 3). Issues of fact also remain here as to those purchase orders not directly at issue in plaintiff's criminal trial.

11. The court in *Putnam Mills Corp.* summarized this theory when it held that "representations or agreements made by an agent of the Government in his representative capacity will not necessarily bind the United States if such an agreement is beyond the agent's authority. In addition, the Government is not estopped from later denying the agent's lack of authority. 479 F.2d at 1338, 202 Ct.Cl. at 9. [Citations omitted]

claim show a total cost for the related items involved of $8,748, an amount far in excess of the $2,500 ceiling. Furthermore the contract mandates that, if it becomes necessary to purchase services in an amount in excess of $2,500, "the Contractor [Berg Realty Company] will refer [the negotiations] to the Government." This reference must be in writing and must be made before the time the services are needed, so as to allow the Government ample opportunity either to enter into the suggested agreement or to obtain the services from an alternative source. Since plaintiff makes no allegation that these provisions were followed, it becomes apparent that the alleged instructions by defendant's agent would have run counter to the provisions of the AMB contract.

The instructions would have also been in direct conflict with the applicable HUD regulations. Chapter 8–2 of the Property Disposition Handbook requires that purchase orders and payment authorizations be used "in connection with each purchase of supplies, materials, equipment, and services. * * *" After substantial completion by the AMB, the pertinent Government form was to be forwarded to HUD officials, where proper purchase order numbers were to be inserted. The absence of any purchase order numbers on these purchase orders demonstrates a clear instance of noncompliance with the applicable regulations. This fact, combined with the showing that specific contract provisions did not authorize such instructions, compels the conclusion that the alleged actions by defendant's agent were unauthorized and conferred on plaintif no right to recover.

## IV

### Plaintiff's Claim 4

■ Finally, plaintiff claims that he was not awarded 11 contracts for which he was the low bidder. According to plaintiff, in failing to award this work to plaintiff, defendant violated the provisions of 41 C.F.R. §§ 1–1.1202(d) and 1–1.1204–1(b), which require the Government to execute and file a "Determination of Non-responsibility" to unsuccessful bidders in plaintiff's position. As a result of this alleged violation of the pertinent regulations, plaintiff seeks recovery of lost profits totalling $6,110. Plaintiff's claim must be denied, since, regardless of the reasons for defendant's failure to award the contracts to plaintiff, he cannot recover lost profits. As we stated in *Keco Industries, Inc. v. United States,* 428 F.2d 1233, 1240, 192 Ct.Cl. 773, 784 (1970):

> One other point which should be disposed of at this time concerns the question of damages. Plaintiff claims that it is entitled to recover * * * lost profits. We find, however that it would be improper for this court to award plaintiff lost profits since the contract under which plaintiff would have made such profits never actually came into existence. *Heyer Prods. Co. v. United States,* 140 F.Supp. 409, 412, 135 Ct.Cl. 63, 69 (1956).

*See McCarty Corp. v. United States,* 499 F.2d 633, 204 Ct.Cl. 768 (1974); *Excavation Constr., Inc. v. United States,* 494 F.2d 1289, 204 Ct.Cl. 299 (1974). Therefore, we grant defendant's motion for summary judgment as it relates to plaintiff's fourth claim and hold that plaintiff is not entitled as a matter of law to recover.[12]

## V

### Defendant's Counterclaim

*Jurisdiction.* Defendant seeks partial summary judgment on its counterclaim for damages pursuant to the False Claims Act, 31 U.S.C. §§ 231–35 (1970). Before reaching the merits of defend-

---

12. In view of our conclusions as to the merits of plaintiff's various claims before this court, we need not discuss in detail the validity of defendant's alternative contention, that all of plaintiff's claims should be forfeited pursuant to 28 U.S.C. § 2514. However, it should be noted that, even at its best, this argument would, following our collateral estoppel discussion, *supra,* affect only those contracts which formed the basis of plaintiff's prior conviction.

ant's argument, we consider plaintiff's contention that this court lacks jurisdiction to hear a counterclaim asserted by the Government under the False Claims Act. In this regard, plaintiff refers us to 31 U.S.C. § 232(A), which provides (regarding False Claims Act violations):

> The several district courts of the United States, the several district courts of the Territories of the United States, within whose jurisdictional limits the person doing or committing such act shall be found, shall wheresoever such act may have been done or committed, have full power and jurisdiction to hear, try, and determine such suit.

Relying on this language, plaintiff contends that "the United States Court of Claims is * * * without jurisdiction to entertain defendant's counterclaim for money damages under [31 U.S.C. §§ 231–35.]"

█ We disagree with plaintiff and conclude that the court does have jurisdiction over a counterclaim by the Government based on the False Claims Act. The jurisdictional issue presently before us is controlled by 28 U.S.C. § 1503, which provides that:

> The Court of Claims shall have jurisdiction to render judgment upon any *set-off* or demand by the United States against *any* plaintiff in such court.

Prior case law demonstrates that Section 1503 prevails in situations such as this one and, therefore, that defendant should be allowed an opportunity to have its counterclaim adjudicated in this forum. In an early decision regarding the jurisdiction of this court, the Supreme Court explained the intent and scope of Section 1503 as follows:

> [Suits against the government in the Court of Claims] are not suits at common law within its true meaning. The government cannot be sued, except with its own consent. It can declare in what court it may be sued, and prescribe the forms of pleading and the rules of practice to be observed in such suits. It may restrict the juris-

diction of the court to a consideration of only certain classes of claims against the United States. Congress, by the act in question, informs the claimant that if he avails himself of the privilege of suing the government in the special court organized for that purpose, he may be met with a set-off, counter-claim, or other demand of the government, upon which judgment may go against him, without the intervention of a jury, if the court, upon the whole case, is of opinion that the government is entitled to such judgment. If the claimant avails himself of the privilege thus granted, he must do so subject to the conditions annexed by the government to the exercise of the privilege.

*McElrath v. United States,* 102 U.S. 426, 440, 26 L.Ed. 189 (1880). More recently, when confronted with a similar jurisdictional question in *Cherry Cotton Mills, Inc. v. United States,* 327 U.S. 536, 539, 66 S.Ct. 729, 730, 90 L.Ed. 835 (1946), the Supreme Court concluded that the purpose of the counterclaim jurisdiction was

> * * * to permit the Government, when sued in the Court of Claims, to have determined in a single suit all questions which involved mutual obligations between the Government and a claimant against it. Legislation of this kind has long been favored and encouraged because of a belief that it accomplishes among other things such useful purposes as avoidance of "circuity of action, inconvenience, expense, consumption of the courts' time, and injustice." *Chicago & N.W.R. Co. v. Lindell,* 281 U.S. 14, 17, 50 S.Ct. 200, 201, 74 L.Ed. 670, and cases cited.

We have found no cases that discuss in detail the precise jurisdictional issue presently confronting us, *i. e.,* whether the court has jurisdiction over a Government counterclaim based on the False Claims Act. However, the court has determined the merits of False Claims Act counterclaims on numerous occasions without questioning the court's jurisdiction to hear the issue. *See, e. g., East-*

*ern School v. United States,* 381 F.2d 421, 180 Ct.Cl. 676 (1967); *Acme Process Equip. Co. v. United States,* 347 F.2d 509, 524–28, 171 Ct.Cl. 324, 350–55 (1965), *rev'd on other grounds,* 385 U.S. 138, 87 S.Ct. 350, 17 L.Ed.2d 249 (1966), *reh. denied,* 385 U.S. 1032, 87 S.Ct. 738, 17 L.Ed.2d 680 (1967); *Klein v. United States,* 285 F.2d 778, 152 Ct.Cl. 8 (1961); *Wagner Iron Works v. United States,* 174 F.Supp. 956, 146 Ct.Cl. 334 (1959); *Little v. United States,* 152 F.Supp. 84, 138 Ct.Cl. 773 (1957). Furthermore, there is one prior decision of the court concerning a somewhat similar matter which aids us in our present determination. In *Erie Basin Metal Prods., Inc. v. United States,* 107 F.Supp. 588, 123 Ct.Cl. 433 (1952), the court was presented with a jurisdictional question regarding the Contract Settlement Act, 41 U.S.C. § 119, which has the following jurisdictional language similar to that found in the False Claims Act:

> The several district courts of the United States, the District of Columbia, the several district courts of the Territories of the United States, within whose jurisdictional limits the person, or persons, doing or committing such act, or any one of them, resides or shall be found, shall, wheresoever such act may have been done or committed, have full power and jurisdiction to hear, try, and determine such suit.
> * * *

In discussing its jurisdiction to hear the Government's counterclaim, the court reasoned that, although as plaintiff, the Government, could bring suit only in the proper District Court, "it does not follow that in an action initiated by a contractor against the United States, the Government cannot assert the rights given it by this Act in a counterclaim in

this court." 107 F.Supp. at 589–90, 123 Ct.Cl. at 436. Speaking of 28 U.S.C. § 1503, the court stated that "[u]nder this section, defendant can assert in this court any right it has against the plaintiffs suing it here, which includes, of course, rights given it by the Contract Settlement Act; and this court, under section 1503 of 28 U.S.C., is empowered to render judgment thereon." 107 F.Supp. at 590, 123 Ct.Cl. at 437. Thus, there is no doubt that our jurisdiction extends to defendant's False Claims Act counterclaim.[13]

*Merits of Defendant's Counterclaim.* Having determined that the court has jurisdiction over defendant's counterclaim, we must consider whether the Government should prevail on its partial summary judgment motion as to this issue. The False Claims Act provides in part that:

> Any person not in the military or naval forces of the United States, or in the militia called into or actually employed in the service of the United States, who shall make or cause to be made, or present or cause to be presented, for payment or approval, to or by any person or officer in the civil, military, or naval service of the United States, any claim upon or against the Government of the United States, or any department or officer thereof, knowing such claim to be false, fictitious, or fraudulent, or who, for the purpose of obtaining or aiding to obtain the payment or approval of such claim, makes, uses, or causes to be made or used, any false bill, receipt, voucher, roll, account, claim, certificate, affidavit, or deposition, knowing the same to contain any fraudulent or fictitious statement or entry * * *

---

13. We note in passing the interesting turnabout by plaintiff on this issue. In his motion to stay the proceedings of the District Court, he argued that "[the Government's] second claim herein duplicates [its] counterclaim in the United States Court of Claims cause, and there appears to be no reason to vary from the rule of comity that the court first obtaining jurisdiction over the subject matter should retain same until a final judgment is entered." Since we have held against plaintiff's jurisdictional argument on its merits, we need not discuss whether plaintiff was actually estopped to deny the jurisdiction of the Court of Claims because of his earlier arguments to the District Court.

shall forfeit and pay to the United States the sum of $2,000, and, in addition, double the amount of damages which the United States may have sustained by reason of the doing or committing such act, together with the costs of suit; and such forfeiture and damages shall be sued for in the same suit.

31 U.S.C. § 231 (1970). It is clear that this statutory language covers conduct as alleged in defendant's counterclaim. In *United States v. Neifert-White,* 390 U.S. 228, 88 S.Ct. 959, 19 L.Ed.2d 1061 (1968), the Supreme Court found that "the Act was intended to reach all types of fraud, without qualification, that might result in financial loss to the Government." 390 U.S. at 232, 88 S.Ct. at 961. The Third Circuit, in *United States v. Rohleder,* 157 F.2d 126 (3rd Cir. 1946), found the False Claims Act applicable to a factual situation similar to the one presently before the court.[14]

■ However, our determination that the False Claims Act is applicable to the activity alleged in defendant's counterclaim does not translate into a total victory for defendant on its motion for partial summary judgment. We are again confronted with problems of outstanding disputes of material fact regarding plaintiff's bidding activities. Unless the uncontroverted facts establish that plaintiff committed the illegal acts described in 31 U.S.C. § 231 with respect to each purchase order sued upon, defendant cannot prevail on its motion for partial summary judgment on the counterclaim. Since 18 U.S.C. § 1001 and 31 U.S.C. § 231 both deal with similar activity—

knowingly making and presenting a false claim to the Government—a criminal conviction under the former statute has been held to establish civil liability for violations of the latter statute. *See United States v. Greenberg,* 237 F.Supp. 439 (S.D.N.Y.1965); *United States v. Levinson,* 369 F.Supp. 575 (E.D.Mich. 1973). It follows that plaintiff is estopped from denying in this civil litigation those facts regarding his activities established by the jury verdict against him in the earlier criminal proceeding.[15] As previously stated, however, collateral estoppel does not apply to those purchase orders which did not form the basis of plaintiff's conviction, and Mr. Brown's affidavit creates an issue of fact which must be remanded for trial. In summary, we grant defendant's motion for partial summary judgment on its counterclaim only to the extent of the purchase orders included in the criminal indictment upon which plaintiff was convicted.

■ *Extent of Damages.* Our final task in this case is to determine the extent of damages defendant is now entitled to recover and what issues remain for trial. As quoted above, the False Claims Act provides for a forfeiture of $2,000, plus twice the amount of damages actually sustained by the United States for each false claim. *See* 31 U.S.C. § 231 (1970). Following the unambiguous language of the statute and the prior case law in this area, we have no difficulty in finding that defendant is entitled to $2,000 for each purchase order for which its partial summary judgment motion has been granted. The to-

---

14. In *Rohleder,* the defendant submitted bids to obtain numerous purchase orders. As in the present situation, three bids were required for each purchase order, one or more of which defendant knew were false and fictitious.

15. The following contracts are listed both in plaintiff's indictment and in defendant's counterclaim: FHA No. 561–137532–203 (P.O. No. 8463); FHA No. 561–149642–203 (P.O. No. 7688); FHA No. 561–152319–221 (P.O. Nos. 7085, 7083, 7084); FHA No. 561–158795–203 (P.O. No. 9107); FHA No. 561–168730–203 (P.O. No. 8025); FHA No. 561–176048–221 (P.O. No. 8495); FHA No. 561–181095–203 (P.O. No. 9606); FHA No. 561–214478–203 (P.O. No. 6230); FHA No. 561–148884–203 (P.O. Nos. 10510, 10169, 10168); FHA No. 561–191409–203 (P.O. No. 10163). (It should be noted that this listing relies on defendant's brief for the purchasee order numbers, since no such information is found on the face of plaintiff's indictment.)

tal forfeiture for these 14 purchase orders which are listed in footnote 15, *supra,* is, therefore, $28,000 to be paid whether or not defendant can prove actual damages. Plaintiff's argument that "[t]he $2,000.00 penalty is to be levied only against each 'project' and not against every purchase order issued," is simply not persuasive. Plaintiff was paid by HUD, not for each house he worked on, but for each purchase order submitted for processing. Therefore, each purchase order must be regarded as a separate claim for purposes of defendant's counterclaim. *See United States v. Ueber,* 299 F.2d 310 (6th Cir. 1962); *United States v. Collyer Insulated Wire Co.,* 94 F.Supp. 493 (D.R.I.1950). This result also makes a good deal of common sense, since it was only through plaintiff's fraudulent conduct that he was able to receive the awards to work on an entire "project" or house. Certainly, we should not allow plaintiff to utilize his fraudulent acts for the purpose of reducing the amount of forfeitures due on defendant's counterclaim.

However, we cannot now determine precisely the amount of damages sustained by the Government. The parties agree that the applicable rule of law for computing the damage figure is the difference between the amount the Government actually paid in reliance on the false claims and the amount it would have paid had there been fair, open and competitive bidding. *See United States*

*v. American Precision Prods.,* 115 F.Supp. 823 (D.N.J.1953). Defendant, however claims that in this instance "the only way to determine the amount of such excess * * * is to take the difference between the amount paid out by the Government and the actual cost of performance to the successful bidder." *Defendant's Initial Brief,* at 43–44. Defendant's assertion in this regard runs counter to the express language of the False Claims Act. Under the Act, the defendant has the burden to prove what amount it lost as a result of plaintiff's fraudulent acts. It must certainly do more than submit a schedule of the costs of performance. A trial is necessary on this issue, especially since plaintiff argues that industry-wide profit figures will demonstrate that his profit margin was neither "unusual nor excessive." *Plaintiff's Response to Defendant's Post-Argument Statement,* at 4.[16]

## VI

### Conclusion

For the reasons stated above, this case is remanded to the trial division for further proceedings in accordance with this opinion. Entry of judgment dismissing certain of plaintiff's claims on which we have held he is not entitled to recover will be deferred, pursuant to Rule 102(d), pending final disposition of the remaining issues remanded for trial.

---

**16.** The discussion regarding defendant's False Claims Act counterclaim deals, of course, only with those purchase orders listed in Defendant's Amended Counterclaim, filed on June 29, 1973. Although it is difficult to believe, defendant seemingly attempts to add five more items to its counterclaim through a footnote in its post-argument brief to the court. *See De-*

*fendant's Post-Argument Statement,* at 4 (footnote 1). Of course, this tactic is highly irregular, and we do not recognize those items as part of defendant's counterclaim at this time. If defendant wishes to amend its counterclaim a second time, it may, within 30 days from the issuance of this opinion, file a motion for leave to do so with the trial judge.