**UNITED STATES of America**

v.

**Charles C. HIBBS, Appellant, and Fairhill Company, Inc.**

**No. 76–2639.**

United States Court of Appeals, Third Circuit.

Argued Oct. 3, 1977.

Decided Dec. 27, 1977.

Thomas B. Rutter, Philadelphia, Pa., for appellant.

Barbara Allen Babcock, Asst. Atty. Gen., Washington, D.C., David W. Marston, U. S. Atty., Philadelphia, Pa., Ronald R. Glancz, Michael F. Hertz, Appellate Section, Alexander Younger, Fraud Section, Civil Division, Dept. of Justice, Washington, D.C., for appellee.

Before GIBBONS and WEIS, Circuit Judges and MEANOR, District Judge.*

## OPINION OF THE COURT

WEIS, Circuit Judge.

 Justice Holmes once commented that those who do business with government should turn square corners. This appeal is by one who disregarded that warning but now asks that the government be required to treat him squarely in an action under the False Claims Act. Though, such an argument might seem incongruous to some, Congress, we believe, intended to be fair in determining what damages the United States may recover under the Act. We conclude that a causal connection must be shown between loss and fraudulent conduct and that a broad "but for" test is not in compliance with the statute. We therefore vacate a judgment entered by a district court, *a contre coeur.*

Defendant Hibbs was a real estate broker who submitted certifications to the Federal Housing Administration misrepresenting the condition of certain residential properties. That agency then insured mortgages on the homes and was later required to pay the mortgages when defaults occurred. The government recovered a judgment in a bench trial for the amount of statutory forfeitures and double the amount of damages alleged. The defendant appeals from the assessment of damages, but does not contest the forfeiture awards.

The facts are not in dispute. In 1969 and 1970 Hibbs procured and filed certificates stating that the plumbing, electrical and heating systems of six houses in Philadelphia met the standards and conditions prescribed by Housing and Urban Development regulations. In fact, there were deficiencies which would have required a total of approximately $3,485 to repair. Being unaware of these facts, the FHA insured mortgages secured by the six houses. In time all six mortgagors defaulted and the FHA was required to pay $59,904.21 to honor its mortgage insurance commitment.[1]

The district court found that the United States was entitled to a statutory forfeiture of $2,000 for each of the six properties. In addition, the government recovered double damages for its payments to the mortgagee covering such items as unpaid principal, taxes, insurance premiums, preservation and maintenance expense, attorney's fees and other foreclosure costs, amounting to $119,808.42, thus making the total judgment $131,808.42.

The district judge determined that the defaults were caused either by the mortgagors' changed financial circumstances or irresponsibility, and that there was no causal connection between the false certifications and the defaults.[2] Moreover, after the

---

* The Honorable H. Curtis Meanor, United States District Court for the District of New Jersey, sitting by designation.

1. In a criminal proceeding Hibbs was convicted on thirty-nine counts of making false statements to the FHA in violation of 18 U.S.C. § 1010 and was fined $195,000.

2. Three of the former mortgagors testified at trial. One defaulted after he lost his job; another after his weekly income decreased as a result of a job change and his monthly mortgage payment increased. The third mortgagor moved into his house relying on rental income from his two brothers to lighten the financial

mortgages were insured, an injunction was issued against the use of lead-based paint in Philadelphia residences. *See City-Wide Coalition Against Lead Paint v. Philadelphia Housing Authority*, 356 F.Supp. 123 (E.D. Pa.1973). This resulted in the houses becoming almost worthless on foreclosure and was an additional factor increasing the government's loss. The lead paint prohibition was in no way related to the certifications which the defendant had submitted. The district judge, feeling compelled by precedent, reached his result reluctantly and characterized it as "harsh indeed," *United States v. Hibbs*, 420 F.Supp. 1365, 1373 (E.D.Pa.1976).

The False Claims Act was enacted during the Civil War and was aimed principally at stopping the massive frauds perpetrated by contractors supplying goods and services for the war effort. There is little help in the way of legislative history and there are few cases interpreting the statute's broad language. The Act is found in Rev.Stat. § 3490 [3] and in pertinent part reads:

"Any person . . . who shall do or commit any of the acts prohibited . . shall forfeit and pay to the United States the sum of two thousand dollars, and, in addition, double the amount of damages which the United States may have sustained by reason of the doing or committing such act . . . ."

The acts referred to are contained in Rev. Stat. § 5438, a lengthy section which provides in pertinent part:

"Every person who makes or causes to be made, or presents or causes to be present-ed, for payment or approval, to . . . the United States, any claim upon or against the Government . . . knowing such claim to be false, fictitious, or fraudulent, or who, for the purpose of obtaining or aiding to obtain the payment or approval of such claim, makes, uses, or causes to be made or used, any false . . certificate . . . shall be . . . fined . . . ." [4]

■ To recover damages here, the United States must show these elements:

1. the government has paid
2. a claim based upon
3. a certificate containing false information
4. which has resulted in damages sustained "by reason of" the doing or committing the act.

There is no question that the first three elements have been proved.

As to the first factor, it has been held that the making of a false certificate, standing alone, does not entitle the government to the statutory forfeiture. There must have been a payment. *United States v. McNinch*, 356 U.S. 595, 78 S.Ct. 950, 2 L.Ed.2d 1001 (1958); *United States v. Tieger*, 234 F.2d 589 (3d Cir. 1956). The requirements for assessment of a forfeiture are less restrictive and it follows that there can be no recovery for damages either, unless payment has been made. Here, the government's expenditures satisfy that prerequisite.

■ The existence of a "claim" has also been established. This court has deter-

---

burden, but both moved out after two months. In filing its claim for payment after default, the mortgagee listed the reason for default on all six houses as "improper regard for obligations." *United States v. Hibbs*, 420 F.Supp. 1365, 1368–69 (E.D.Pa.1976).

**3.** The codification of this section at 31 U.S.C. § 231 has not been enacted into positive law, and the official text appears in the Revised Statutes:

§ 3490. Any person not in the military or naval forces of the United States, or in the militia called to or actually employed in the service of the United States, who shall do or commit any of the acts prohibited by any of

the provisions of section fifty-four hundred and thirty-eight, Title 'Crimes', shall forfeit and pay to the United States the sum of two thousand dollars, and, in addition, double the amount of damages which the United States may have sustained by reason of the doing or committing such act, together with the costs of the suit; and such forfeiture and damages shall be sued for in the same suit.

**4.** In addition to its publication in the Revised Statutes, the full text of the statute may be found in *United States v. Bornstein*, 423 U.S. 303, 305 n.1, 96 S.Ct. 523, 526, 46 L.Ed.2d 514 (1976).

mined that payment by the government under the terms of an FHA guarantee or a mortgage constitutes a "claim" within the meaning of the Act. *United States v. Veneziale,* 268 F.2d 504 (3d Cir. 1959). The Supreme Court expressly reserved the question in *United States v. McNinch, supra,* 356 U.S. at 599 n.6, 78 S.Ct. 950.

In addition, the trial court found that the defendant caused certifications containing false information to be supplied to the FHA. The first three elements having been demonstrated, the issue centers on whether the government has been damaged by the doing of a prohibited act. In determining what the proscribed "act" was, we look to the actions of defendant Hibbs, rather than those of the mortgagee, an innocent party which simply transmitted the fraudulent data to the FHA. *United States v. Bornstein,* 423 U.S. 303, 313, 96 S.Ct. 523, 46 L.Ed.2d 514 (1976). The offending conduct is the furnishing of false certificates by Hibbs. Next, the inquiry must be directed toward determination of what damage the United States sustained "by reason of" Hibbs' false certifications. The government's position is that had Hibbs not furnished the false certification, it would not have insured the mortgage and therefore would not have been called upon to make any payment—*post hoc ergo propter hoc.*

We are unable to accept this argument because it ignores the statute's restrictive language "by reason of." The damages were sustained by the United States because of defaults by the mortgagors and to some extent were increased by the unexpected diminution of property value caused by the lead paint injunction. Neither of those events was caused by or related to the false certifications. Indeed, precisely the same loss would have been suffered by the government had the certifications been accurate and truthful. To further illustrate the extreme to which the government's argument would lead—if the mortgagors had defaulted because their houses had been destroyed by a flood or some other uninsured catastrophe, the government's theory would nevertheless hold Hibbs liable because he failed to call its attention to defects in the plumbing. We cannot conceive that Congress intended such an inequitable result.

The statutory limitation, "by reason of" the commission of the unlawful act, compels consideration of the element of causation. That requirement should be liberally construed so as to provide the government restitution from those whose fraud has caused loss. It should not, however, be disregarded completely so as to eliminate the relationship between the unlawful act and the injury ultimately sustained.

The government's actual damage was the decrease in worth of the security that was certified as being available, measured by the difference in value between the houses as falsely represented, and as they actually were. Since the government was given security which was less than what it was represented to be, the damages are essentially similar to those sustained when a defective article is purchased in a fraudulent transaction. In those instances, decisional law sets the damages as the difference in cost between that contracted for and that received.

In *United States v. Woodbury,* 359 F.2d 370, 379 (9th Cir. 1966), the court found the government's damages to be the amount paid out by reason of a false statement over and above what it would have paid if the claims had been truthful. In discussing the government's failure of proof, the court said: "But there is no showing that it would not ultimately have paid out the same amount of money, or that it would have received a more valuable security for the loan, or if so, by how much."

In *United States v. Cooperative Grain & Supply Co.,* 476 F.2d 47, 61–63 (8th Cir. 1973), the government argued that it would not have made any warehouse payments at all had it been aware that part of a grain shipment did not comply with federal regulations. The court rejected the contention and held the government was required to

pay for storage of that part of the grain which met the requirements of the statute under consideration. In *Brown v. United States*, 524 F.2d 693, 207 Ct.Cl. 768 (1975), the court treated the measure of damages issue by stating simply "[t]he parties agree that the applicable rule of law for computing the damage figure is the difference between the amount the government actually paid in reliance on the false claims and the amount it would have paid had there been fair, open and competitive bidding." 524 F.2d at 706.

*United States v. Aerodex*, 469 F.2d 1003 (5th Cir. 1973), was a claim based on delivery of bearings fraudulently misrepresented as being suitable for certain aircraft engines. The United States sought damages not only for the contract price of bearings, but the expense incurred in removing the defective parts which had been placed in engines before discovery of the fraud. The court determined that those charges constituted consequential damages not recoverable under the Act because they had not been caused by the submission of false vouchers.

Adopting a less stringent view of causation, the Court of Appeals for the Sixth Circuit in *United States v. Ekelman & Associates*, 532 F.2d 545 (6th Cir. 1976), allowed recovery for the expense of preserving and maintaining mortgaged property. In that case, the government incurred expense after default on Veterans Administration and FHA guaranteed mortgages. Significantly, the false information furnished to the government bore upon the likelihood of the applicants meeting mortgage payments, and thus the misrepresentation had a causal connection with the subsequent defaults.

*Toepleman v. United States*, 263 F.2d 697 (4th Cir.), *cert. denied sub nom. Cato Bros. v. United States*, 359 U.S. 989, 79 S.Ct. 1119, 3 L.Ed.2d 978 (1959), did not analyze the causation issue. The Court of Appeals for the Fourth Circuit held simply that since cotton pledged as security for notes came into the government's possession as a result of defendant's fraud, a loss resulting from a drop in the value of the collateral had to be borne by the defendants. The situation in *Toepleman* is distinguishable in that the false representations—going to ownership of the cotton—were critical to eligibility for a loan. The concealed defects there could not be remedied, as was possible in the case *sub judice.* In any event, we do not adopt *Toepleman*'s rationale to the extent that it is inconsistent with our approach.

The government contends that our decision in *United States v. Veneziale, supra,* supports its position. That case, however, did not discuss the issue of causation and focused on whether there had been a "claim" within the meaning of the Act. Moreover, the false representation in that case arguably had some relevance to the credit worthiness of the borrower as well as the value of security, and thus causal connection with the default which later occurred.

In closing, we repeat that the defendant has not contested the assessment of forfeitures and hence we have not been required to consider that issue. It is worth observing, however, that the statutory language for forfeiture does not include the phrase "by reason of."

Concluding that the measure of damage was not properly applied, we vacate the judgment of the district court and remand the case to it for further proceedings consistent with this opinion.

MEANOR, District Judge, dissenting.

I dissent because I believe that the majority has misconstrued the False Claims Act and has misapplied binding precedents in so doing. While I sympathize with the majority's desire to ameliorate what otherwise seems to be an unduly harsh result, I do not believe that the path taken is legitimately open.

The facts are virtually undisputed and are well stated in Judge Luongo's opinion for the district court, *United States v. Hibbs*, 420 F.Supp. 1365 (E.D.Pa.1976) and in the majority opinion.

There can be no question but that Hibbs, as to the six properties in question, made false certifications concerning their condition to the FHA. The FHA relied on these statements in issuing its mortgage insurance and had the statements not been false, FHA insurance would not have issued regarding the six mortgages in question. It is clear that the defaults by the mortgagors on these six properties were not caused by nor were they in any way related to the conditions that were the subject of Hibbs' false certifications.

Normally, one would believe that the government's damages, when called upon to pay its FHA insurance following default of a mortgagor, would be the difference between the amount required to be paid because of the mortgage insurance obligation and the market value of the property, plus the costs of foreclosure and sale. Here that difference is the full amount of the insurance obligation because the properties, at the time of default, were valueless. The lack of value resulted from a lead paint condition of the properties and a prohibition against their sale because of it. The lead paint condition was not the subject of any certification by Hibbs and the lack of value of these properties can in no way be said to be Hibbs' responsibility. I suspect that if, as would normally have been the course, these properties had had post-default sale value approximating the amount of the outstanding mortgage balances, the majority would not be straining precedent, and the result would be different.

For me, the case is a simple one, clearly controlled by the language of the False Claims Act and two cases which bind us.

It cannot be denied that the two controlling statutes set forth in pertinent part in the court's opinion, Rev.Stat. § 3490 and § 5438,* assess double the damages sustained by the United States "by reason of" the presentation of a false claim. It should be emphasized that it is the damages arising out of the false claim for which liability

is imposed and not damages arising out of the cause of the falsity of the claim.

Here Hibbs did not make a false claim. Rather, because of his false certifications, he caused a false claim to be made within the interdiction of § 5438. A rational argument can be made that the false claim Hibbs caused was the application for FHA mortgage insurance. That result is absolutely foreclosed by *United States v. McNinch*, 356 U.S. 595, 78 S.Ct. 950, 2 L.Ed.2d 1001 (1958) which held squarely that an application for credit insurance was not a "claim" within the meaning of the False Claims Act.

Following *McNinch* the question arose as to what, if any, action for damages under the False Claims Act was given to the United States when a false statement in a credit application triggered the grant of FHA insurance. That question was answered in *United States v. Veneziale*, 268 F.2d 504 (3d Cir. 1959) by a holding that a false statement in a credit application would give rise to an action for double the damages sustained by the United States as a consequence of honoring its credit insurance obligation.

Thus, under the binding authority of *McNinch* and *Veneziale* it is clear that Hibbs:

1. caused six false claims to be made;

2. those false claims were the claims that the FHA honor its credit insurance obligations on each of the six properties in question;

3. and that Hibbs, therefore, is obligated to pay double damages arising out of the payment of these six obligations.

Since the six properties were valueless, or virtually so, the damages of the United States on the payments of these six insurance commitments are the total amounts paid.

The False Claims Act awards double damages sustained by the United States by reason of the false claim. It does not

* § 5438 was repealed in 1909. Act of March 4, 1909, c. 321, § 341, 35 Stat. § 1153. It has continuing vitality only insofar as it specifies the acts giving rise to civil liability under § 3490. *U. S. v. Bornstein*, 423 U.S. 303, 307 n.1, 96 S.Ct. 523, 46 L.Ed.2d 514 (1976).

award damages occasioned by the cause of the falsity of the claim. If it did, then the majority's direction of a damage award in an amount double the diminution of the value of the government's security would be quite proper. What the court has done is to award damages on the thesis that *McNinch* had gone the other way and held that the claim for credit insurance is the false claim in a context such as this. Damages, hence, are said to be those occasioned by the cause of the false claim, and not those brought about by the false claim itself. Since I am of the opinion that in modifying the damage award of the district court, the majority has contravened both *McNinch* and *Veneziale*, I dissent and vote to affirm.