UNITED STATES OF AMERICA, ex rel. Elizabeth DRESCHER, Plaintiff,

v.

HIGHMARK, INC., Defendant.

No. 03–CV–4883.

United States District Court, E.D. Pennsylvania.

Feb. 20, 2004.

---

452

Mitchell R. Kreindler, Kreindler & Associates, P.C., Houston, TX, for Plaintiff.

Nancy L. Griffin, Patricia D. Gugin, Virginia A. Gibson, U.S. Attorney's Office, Philadelphia, PA, Stanley Alderson, U.S. Department Justice, Washington, DC, for Intervenor Plaintiff.

Andrew J. Soven, Reed Smith, LLP, Philadelphia, PA, Kathleen E. Karelis, W. Jay Devecchio, Miller & Chevalier, Wash-

ington, DC, W. Thomas McGough, Jr., Reed, Smith, Shaw & McClay, Pittsburgh, PA, for Defendant.

### *MEMORANDUM AND ORDER*

ANITA B. BRODY, District Judge.

## I. INTRODUCTION

The United States of America and relator Elizabeth Drescher filed this *qui tam* action against Highmark, Inc. ("Highmark") for violations of the False Claims Act[1] ("FCA"), 31 U.S.C. § 3729(a)(1), for recovery of Medicare overpayments pursuant to the Medicare Secondary Payer Statute ("MSP"), 42 U.S.C. § 1395y(b)(2)(B)(ii), and for unjust enrichment and breach of contract. Counts I and II are claims against Highmark for violations of the FCA in its capacity as a private insurer and in its capacity as a public insurer, respectively. Count III is a claim against Highmark in its capacity as a private insurer for recovery of Medicare overpayments pursuant to the MSP statute, 42 U.S.C. § 1395y(b)(2)(B)(ii). Count IV is a claim against Highmark in its capacity as a private insurer for unjust enrichment, and Count V is a claim against Highmark in its public capacity for breach of its contract with the Health Care Financing Administration ("HCFA") to perform services as a Medicare Part A fiscal intermediary and as a Medicare Part B carrier.[2] In addition to the five counts alleged by the United States in its complaint, the relator's personal claims against Highmark for unlawful retaliation pursuant to 31 U.S.C. § 3730(h) also remain.[3]

Presently before the court are Highmark's motion to dismiss all counts contained in the United States' complaint in intervention and Highmark's motion to dismiss the relator's retaliation claims. For the reasons set forth below, I deny Highmark's motions.

## II. BACKGROUND

### A. Medicare System

Medicare is a federal insurance program administered by the Department of Health and Human Services ("HHS"), Center for Medicare and Medicaid Services ("CMS"), and established by Congress to pay the costs of health care services provided to individuals who are elderly, disabled, or extremely ill as a result of contracting End–Stage Renal Disease ("ESRD"). 42 U.S.C. §§ 1395—1395gg; 42 C.F.R. Part 405 *et seq.* The Medicare Program is comprised of two parts: Medicare Part A

---

**1.** An action under the False Claims Act can be commenced in one of two ways. The United States Department of Justice can file suit, or, alternatively, a private plaintiff can institute a *qui tam* action on behalf of the United States to recover damages incurred due to fraudulent claims. 31 U.S.C. § 3730(b)(1), *cited in Hutchins v. Wilentz et al.*, 253 F.3d 176, 181 (3d Cir.2001) *cert. denied*, 536 U.S. 906, 122 S.Ct. 2360, 153 L.Ed.2d 182 (June 10, 2002). When suit is brought by a private plaintiff in this fashion, the government can elect to intervene. 31 U.S.C. § 3730(b)(2). The private plaintiff, known as the relator, will receive up to 25% of the recovered funds if the *qui tam* suit proves successful. 31 U.S.C. § 3730(d). On July 12, 2000, plaintiff and relator Elizabeth Drescher filed a *qui tam* complaint against Highmark on behalf of the United

States. On January 14, 2003, the United States filed its notice of election to intervene. The United States subsequently filed its complaint in intervention on April 15, 2003.

**2.** HCFA is the former name of the Centers for Medicare and Medicaid Services ("CMS"). (Compl.¶ 5.) CMS was known as HCFA during most of the years relevant to this litigation. Although the United States' complaint uses the term "HCFA," throughout this opinion I will refer to HCFA as CMS.

**3.** The United States' complaint in intervention supersedes all allegations in the original complaint filed by the relator on behalf of the United States.

helps pay for inpatient hospital services, nursing home and hospice care, and in some instances home health services; Medicare Part B provides federal government funds to help pay for outpatient hospital services, doctor's visits, certain durable medical equipment and supplies, and, in some instances, home health services. (Compl.¶ 10.)

The United States pays for services provided to Medicare beneficiaries through CMS. (Compl.¶ 11.) CMS, however, does not directly process Medicare claims. Rather, CMS contracts with private companies to handle claims processing responsibilities.[4] (Compl.¶ 11.) "Fiscal intermediaries" is the term used to refer to private insurance companies that process Medicare Part A and some Part B claims. Private insurance companies that process the bulk of Medicare Part B claims are referred to as "carriers." (Compl.¶ 11.) Pursuant to contracts with CMS, carriers and intermediaries (collectively "contractors") perform claims processing functions, including making determinations whether submitted claims should be paid. (Compl.¶ 12.) When a contractor approves a Medicare claim, the contractor pays the claim with funds from the taxpayer-funded Medicare Trust Fund. (Compl.¶ 12.) In the process of paying a claim with Medicare funds, the contractor must "certify that all payments are in accordance with applicable law and Medicare rules and instructions." (Compl.¶ 12.) Contractors are compensated for performing these functions through administrative payments from the United States. (Compl.¶ 12.)

### B. Medicare as Secondary Payer

In certain cases an individual who is otherwise eligible for Medicare coverage also has private group health plan coverage through an Employer Group Health Plan ("EGHP"). (Compl.¶ 13.) Congress endeavored to coordinate the provision of payment in situations in which an individual has overlapping Medicare benefits and private insurance coverage by enacting the MSP statute. Essentially a cost-cutting amendment, "[t]he MSP statute was designed to curb skyrocketing health costs and preserve the fiscal integrity of the Medicare System." *Fanning v. United States*, 346 F.3d 386, 388 (3d Cir.2003) (citations omitted). The MSP statute and related regulations dictate when Medicare will pay a medical claim as the "primary payer," and when Medicare will pay as the "secondary payer." (Compl.¶ 14.) Because a "secondary payer" is responsible for, at most, that portion of a claim for which the primary payer's coverage did not provide payment, the secondary payer generally pays a smaller portion of a claim than the amount paid by the primary payer. (Compl.¶ 14.)

Generally, under the MSP statute and related regulations, the private insurance carrier is the primary payer.[5] *See, e.g.,* 42 U.S.C. § 1395y(b)(1)(A),(B); 42 C.F.R. §§ 411.172, 411.101, 411.204. While this is the general rule, two exceptions are made for small employers. Specifically, in the case of working aged beneficiaries (age 65 or older) participating in group health plans sponsored by an employer or em-

---

**4.** When Congress created the Medicare program in the 1960s, Congress decided to use private insurance companies for claims administration and processing rather than create a bureaucracy to process Medicare claims. 42 U.S.C. § 1395h(a), u(a).

**5.** Medicare coverage is secondary to employer-sponsored group health coverage if the Medicare beneficiary is (a) age 65 or older; (b) entitled to Medicare on the basis of age; and (c) covered under a group health plan by virtue of his or her "current employment status" or the current employment status of a spouse of any age. 42 C.F.R. § 411.20(a)(ii).

ployee organization, Medicare becomes the primary payer if the employer has fewer than 20 employees. 42 U.S.C. § 1395y(b)(1)(A)(ii). In the case of employees who are under age 65 and covered under a group health plan, but are entitled to Medicare by virtue of a disability, Medicare will be the primary payer if the employer has fewer than 100 employees. (Compl.¶ 18.)

## C. The Life of a Claim

The MSP claims process begins with the provider of health care services. After furnishing services, the provider makes an initial determination whether a claim will be submitted to a private insurance contractor or to a Medicare contractor. (United States' Supp. Br. in Opp'n to Highmark's Mot. to Dismiss [hereinafter U.S. Supp. Br.] at 3.) In this regard, CMS directs providers to ask patients a series of questions designed to elicit whether Medicare or a private insurer is the primary payer. CMS Hospital Manual § 301.2, Part III, "Types of Admission Questions To Ask Medicare Beneficiaries." Likewise, if the provider determines that the claim should be submitted to Medicare, the MSP statute requires that the provider use the information obtained from the individual in order to complete a Medicare claim form. 42 U.S.C. § 1395y(b)(6). If the provider determines that a private insurer should pay as primary, the provider will submit the claim first to the private insurer. (United States' Supp. Br. in Opp'n to Highmark's Mot. to Dismiss [hereinafter U.S. Supp. Br.] at 3.) Upon receipt of the claim, the private insurer makes an independent determination regarding their obligation to pay the claim. *Id.* at 3–4. While the precise nature of the system used by a private insurer to determine whether to pay or deny a submitted claim, including any criteria or sources of information used, is notably absent from the parties' filings, it is axiomatic that the private insurer must have some mechanism through which these decisions, a routine and integral aspect of their operations, are made. If the private insurer refuses to pay the claim, the denied claim is returned to the provider. (U.S. Supp. Br. at 4.) Thereafter, the provider may submit the claim to a Medicare contractor for payment from the Medicare Trust Fund. (U.S. Supp. Br. at 4.)

## III. FACTS [6]

Highmark is a Pennsylvania based corporation and acts both in a private capacity as an insurer and in a public capacity as a Medicare contractor. In its private capacity, Highmark is a private insurance carrier that insures and administers EGHPs.[7] In its public capacity, Highmark processes claims, performs customer service, and maintains provider relations for the Medicare program pursuant to contracts with CMS. Highmark operates as a Medicare Part A fiscal intermediary through its division Veritus Medicare Services ("Veritus") and as a Medicare Part B carrier through its division HGS Administrators ("HGS"). (Compl.¶ 6.)

**6.** As required when ruling on a motion to dismiss, the facts as averred by plaintiffs are accepted as true for purposes of this motion. *Nami v. Fauver,* 82 F.3d 63, 65 (3d Cir.1996).

**7.** As a member of the Blue Cross and Blue Shield Association ("BCBSA"), Highmark functions in its private capacity as a Blue Cross and Blue Shield Plan. The BCBSA is a federation of independent, locally operated Blue Cross Blue Shield marks, establishes and benefits. BCBSA owns and licenses the Blue Cross Blue Shield marks, establishes and implements performance standards, and provides other global services for member plans. (Compl.¶¶ 26–27.)

While the submissions of the parties are devoid of information concerning the actual process by which Highmark, acting as a private insurer, makes a determination whether to pay or deny a claim and how Highmark obtains the data used to make that determination, the United States' complaint does make allegations through which certain features of Highmark's claims processing system can be inferred. Specifically, the complaint alleges that Highmark's predecessors, Blue Cross of Western Pennsylvania and Pennsylvania Blue Shield, entered into a settlement with the United States in July 1995 concerning allegations of wrongdoing under the MSP statute. (Compl.¶ 28.) The United States further alleges that Highmark is bound by the terms of that settlement which included obligations that the settling plans "review [ ] current data collection efforts and modify existing data collection procedures if necessary to comply with the terms of the settlement agreement," including "the obligation to make a primary/secondary determination with respect to Medicare eligible employees and beneficiaries based on the best available membership data collected." (Compl.¶¶ 30, 31.) The relator, Elizabeth Drescher, is an employee of Highmark who was appointed in July 1996 to the position of project manager responsible for the company's implementation of the 1995 settlement agreement between the government and BCBSA. At some point, it is alleged that her tasks were expanded to include "more general MSP compliance issues." (Compl. ¶ 7.)

## IV. STANDARD OF REVIEW

A motion to dismiss pursuant to Federal Rule of Civil Procedure 12(b)(6) challenges the legal sufficiency of the complaint. *Kost v. Kozakiewicz*, 1 F.3d 176, 183 (3d Cir.1993). In ruling on a motion to dismiss pursuant to Federal Rule of Civil Procedure 12(b)(6), a court must "accept as true the factual allegations in the complaint and all reasonable inferences that can be drawn therefrom." *Nami v. Fauver*, 82 F.3d 63, 65 (3d Cir.1996). Since the court must determine whether "under any reasonable reading of the pleadings, the plaintiff may be entitled to relief," a claim may be dismissed only "if it appears that the plaintiffs [can] prove no set of facts that would entitle them to relief." *Id.*

## V. DISCUSSION

### A. The False Claims Act—Count I

In Count I, the United States alleges that Highmark violated the FCA in its capacity as a private insurer. The False Claims Act extends civil liability to any person who:

(1) knowingly presents, or causes to be presented, to an officer or employee of the United States Government or a member of the Armed Forces of the United States a false or fraudulent claim for payment or approval;

(2) knowingly makes, uses or causes to be made or used, a false record or statement to get a false claim or fraudulent claim paid or approved by the Government;

(3) conspires to defraud the Government by getting a false or fraudulent claim allowed or paid;

* * *

(7) knowingly makes, uses or causes to be made or used, a false record or statement to conceal, avoid, or decrease an obligation to pay or transmit money or property to the Government, is liable to the United States Government for a civil penalty of not less than $5,000 and not more than $10,000, plus three times the amount of damages which the Govern-

ment sustains because of the act of that person. . . .

31 U.S.C. § 3729(a).

■ To establish a prima facie case under § 3729(a)(1) of the False Claims Act the United States must prove: (1) the defendant presented or caused to be presented to an agent of the United States a claim for payment; (2) the claim was false or fraudulent; and (3) the defendant knew the claim was false or fraudulent. *Hutchins v. Wilentz et al.*, 253 F.3d 176, 182 (3d Cir.2001) *cert. denied*, 536 U.S. 906, 122 S.Ct. 2360, 153 L.Ed.2d 182 (June 10, 2002). Liability under the FCA will not attach unless the plaintiff can satisfy his or her burden of proof with respect to each of the three elements. Because satisfaction of the first element of the FCA is the most problematic in this case, I will first discuss the second and third elements of a prima facie case under the False Claims Act, followed by a lengthier analysis of the requirements necessary to satisfy the first element.

■ To satisfy the second element of the FCA, the United States must establish that the claim was false or fraudulent. 31 U.S.C. § 3729(a)(1). Under the FCA, a claim "includes any request or demand ... for money ... if the United States Government provides any portion of the money ... which is requested or demanded." 31 U.S.C. § 3729(c). Furthermore, because "[t]he False Claims Act seeks to redress fraudulent activity which attempts to or actually causes economic loss to the United States government," liability does not attach unless the claim "would result in economic loss to the United States government." *Hutchins*, 253 F.3d at 184. Although the terms "false or fraudulent" are not defined in the FCA, "the juxtaposition of the word 'fraud' with the word 'false' plus the word 'claim' suggests that a false or fraudulent claim is one aimed at extracting money the government otherwise would not. have paid." *United States ex rel. Michael D. Watson v. Conn. Gen. Life Ins. Co.*, Civ. Action 98–6698, 2003 WL 303142 at *4 (E.D.Pa.2003) (internal citations omitted) (citing *Mikes v. Straus*, 274 F.3d 687, 696 (2d Cir.2001)). Moreover, because the Supreme Court has held that the FCA "is intended to reach all types of fraud, without qualification, that might result in financial loss to the Government" and "reaches beyond 'claims' which might be legally enforced, to all fraudulent attempts to cause the Government to pay out sums of money," the term "false or fraudulent claim" should be construed broadly. *United States v. Neifert–White Co.*, 390 U.S. 228, 232–33, 88 S.Ct. 959, 19 L.Ed.2d 1061 (1968).

■ In the complaint, the United States alleges that Highmark, as a private insurer or administrator, improperly paid MSP claims as the secondary payer when it should have paid them as the primary payer. (Compl.¶ 35.) Tying Highmark's private claims processing system to claims presented to Medicare for payment, the United States alleges that:

> [W]hen a private insurer, such as Highmark, pays claims as secondary payer or refuses to pay claims at all, based on supposed coverage by Medicare as the primary payer, the provider or beneficiary will typically submit the claims to Medicare for primary payment. If Medicare is unaware of the private insurer's obligation to pay primary, Medicare will pay those claims as primary rather than as secondary.

(Compl.¶ 38.) The United States alleges that as a result of Highmark's knowing dereliction of its obligation to pay certain claims or to pay as the primary payer, claims that should have been paid by Highmark were ultimately presented to and paid by Medicare. (See Compl. ¶ 38.)

These allegations sufficiently state a claim under the second element of the FCA for purposes of avoiding dismissal under Federal Rule of Civil Procedure 12(b)(6).

■ To satisfy the third element of the FCA, the United States must establish that Highmark "knew the claim was false or fraudulent." *Hutchins,* 253 F.3d at 182. In the context of the False Claims Act, the term "knowingly" is defined as follows:

> "knowing" and "knowingly" mean that a person, with respect to information-
>
> (1) has actual knowledge of the information;
>
> (2) acts in deliberate ignorance of the truth or falsity of the information; or
>
> (3) acts in reckless disregard of the truth or falsity of the information, and no proof of specific intent to defraud is required.

31 U.S.C.A. § 3729(b). In the complaint, the United States asserts that Highmark was aware of applicable regulations regarding primary/secondary payment and knew that it was not accurately processing MSP claims. (Compl.¶¶ 33, 73.) In support of this conclusion, the United States avers that Highmark actually obtained information relevant to making accurate determinations regarding Highmark's payment obligations but nonetheless failed to incorporate such information into its claims processing systems. (Compl.¶ 33.) Thus, with regard to the third element of a prima facie case under the FCA, the United States has likewise stated a claim upon which relief could be granted.

■ To establish the first element of their prima facie case, the United States must prove that Highmark, in its private capacity, presented or caused to be presented to Medicare a claim for payment. *Hutchins,* 253 F.3d at 182. Because the United States does not allege that Highmark, in its capacity as a private insurer, directly presented claims to Medicare for payment, the United States is proceeding under the theory that Highmark *caused* certain claims to be presented to Medicare. (Compl.¶ 72.)

The novel theory that the United States presents can be summarized as the following chain of events: (1) Highmark, as result of violations of the MSP rules, incorrectly denied claims or paid claims as the secondary payer when it should have paid as the primary payer; (2) as a result of Highmark's denial or secondary payment, the claims were returned to the providers who originally submitted them; (3) upon receipt of a claim that was denied or not paid in full, the providers then submitted the claim to Medicare for payment; (4) Medicare paid the claim, or paid the claim as primary, even though it may not have been obligated to under law.

The applicability of the FCA to this theory of liability has never before been tested. However, although "[t]he archetypal qui tam FCA action is filed by an insider at a private company who discovers his employer has overcharged under a government contract," courts have been willing to entertain FCA actions under numerous alternative theories. *United States ex rel. Hopper v. Anton,* 91 F.3d 1261, 1266 (9th Cir.1996) (internal citations omitted) (listing theories of liability); *see, e.g., United States ex rel. Hagood v. Sonoma County Water Agency,* 929 F.2d 1416 (9th Cir. 1991) ("fraud-in-the-inducement" cases, i.e. finding FCA liability when a contract was originally obtained based on false information); *United States v. Hibbs,* 568 F.2d 347 (3d Cir.1977) ("false certification" cases, i.e. finding FCA liability where defendant falsely certified compliance with certain requisite conditions in order to fraudulently induce government benefit); *United States v. Aerodex,* 469 F.2d 1003 (5th Cir. 1972) (finding FCA liability where defen-

dants supplied substandard products or services under government contract). More importantly in the context of the present action, the Third Circuit has also recognized FCA actions in cases in which a "defendant causes, or will cause, [an] intermediary to make a false claim against the government resulting in a financial loss to the treasury." *Hutchins*, 253 F.3d at 185; *see, e.g., United States v. Bornstein*, 423 U.S. 303, 309, 96 S.Ct. 523, 46 L.Ed.2d 514 (1976) ("It is settled that the Act ... gives the United States a cause of action against a subcontractor who causes a prime contractor to submit a false claim to the Government.").

In *Hutchins*, the issue presented to the Third Circuit was whether a law firm's submission of fraudulent legal bills *for approval* by the United States Bankruptcy Court violated the FCA even though no claim was made against United States Treasury money in connection with the firm's fraudulent act. *Hutchins*, 253 F.3d at 182. Although the Third Circuit held that the FCA "only prohibits fraudulent claims that cause or would cause economic loss to the government," the court pointed out that in cases in which a defendant caused an intermediary to make a false claim against the government, "[t]he intermediary need not have discretion over, or even possession of, the government funds to establish that the defendant violated the False Claims Act." *Hutchins*, 253 F.3d at 185.

Although the potential for liability under the FCA in situations in which there is a degree of separation between the defendant and the government entity to which claims are ultimately presented is well settled, there is an important distinction between cases which have recognized this kind of liability and the present action. In cases recognizing the liability of a defendant who "causes" an intermediary to submit a false or fraudulent claim to a government entity, the factual scenario is typically such that the intermediary is "merely a conduit to the transfer of government funds." *Hutchins*, 253 F.3d at 185–86. For example, in *United States v. Murph*, the Sixth Circuit affirmed a conviction under 18 U.S.C. §§ 2(b) and 287[8] of a defendant who sold a false income tax return to a discounter knowing "that the discounter was buying it for the purpose of presenting it to the government for a refund." 707 F.2d 895, 896 (6th Cir.1983) (per curiam). Although the defendant in *Murph* argued that his scheme, and his potential liability, ended when he sold the fraudulent tax return to the tax discounter, the Sixth Circuit held that because the defendant knew that the tax discounter intended to present the return to the government for payment, "[t]his further act on behalf of the discounter was clearly understood and foreseen by the defendant," such that the "defendant 'caused' the return to be presented within the meaning of the Act." *Murph*, 707 F.2d at 896.

---

**8.** The civil false claims statute, 31 U.S.C. § 3729, is the civil analog of the criminal false claims statute, 18 U.S.C. § 287. Similarly to the civil False Claims Act, 18 U.S.C. § 287 establishes criminal penalties against "[w]ho[m]ever makes or presents to any person or officer in the civil, military, or naval service of the United States, or to any department or agency thereof, any claim upon or against the United States, or any department or agency thereof, knowing such claim to be false, fictitious, or fraudulent." Because 18 U.S.C. § 2(b) likewise attaches criminal penalties for "willfully caus[ing] an act to be done which if directly performed ... would be an offense against the United States," 18 U.S.C. § 287 and 18 U.S.C. § 2(b) jointly establish criminal liability for willfully causing a claim to be presented. For this reason, the Sixth Circuit's reasoning with respect to the element of causation is informative to the resolution of the present issue.

The United States has asked this court to extend liability to Highmark for the providers' submission of rejected claims to Medicare. While the direct presentation of claims to the government is not a necessary prerequisite for liability under the FCA, it is equally true that the government must not be given *carte blanche* to proceed under the FCA using indirect theories of causation which offer only attenuated links between the parties.[9] In assessing this claim, this court will utilize traditional principles of causation analysis to determine when parties should be subject to potential liability under the FCA, i.e. when it can fairly be said that a party "caused" a claim to be presented to the government. In fact, the Third Circuit has used this approach to limit potential liability under the FCA with respect to applicable damages. *Hibbs*, 568 F.2d at 349; *see also United States ex rel. Cantekin v. Univ. of Pittsburgh*, 192 F.3d 402, 416 (3d Cir.1999), *cert. denied* 531 U.S. 880, 121 S.Ct. 192, 148 L.Ed.2d 133 (2000) (recognizing applicability of the "basic principle of tort law that once a defendant sets in motion a tort, the defendant is generally liable for the damages ultimately caused, unless there are intervening causes" in assessing damages under the FCA). Specifically, the Third Circuit has held that in assessing damages under the FCA, "a causal connection must be shown between loss and fraudulent conduct" and that "a broad 'but for' test is not in compli-

ance with the statute." *Hibbs*, 568 F.2d at 349. It would seem that a similar causation analysis must be conducted before a party is held liable under the FCA for causing a false or fraudulent claim to be presented to the United States government.

Applying such an analysis to the allegations at hand, it can be said that when an intermediary serves as "merely a conduit" to the submission of a false or fraudulent claim, a direct causal relationship can be inferred between the party who submitted the claim to the intermediary and the party who received the claim from the intermediary. *See Hutchins*, 253 F.3d at 185; *Murph*, 707 F.2d at 896. Although this case presents a situation in which FCA liability is likewise predicated upon the presentation of a claim by an intermediary of sorts, namely numerous unidentified providers, the provider is a different kind of "intermediary" than those present in prior cases. Providers in receipt of claims rejected by Highmark are not merely conduits—they do not pass claims along to the government in the same foreseeable and predictable sense as, for example, the tax discounter in *Murph*. In this case, the chain of causation between Highmark's rejection of a claim submitted by a provider, and the subsequent presentation of that claim by the provider to Medicare, is more tenuous. While a simple "but-for" analysis may connect Highmark to the ultimate presentation of the claim to Medicare,

---

**9.** Several circuits have cautioned against equating every regulatory violation or breach of contract with a potential FCA action. For example, in *United States ex rel. Hopper v. Anton*, the Ninth Circuit cautioned that while it is likely that other remedies exist, "[i]t is not the case that any breach of contract, or violation of regulations or law, or receipt of money from the government where one is not entitled to receive the money, automatically gives rise to a claim under the FCA." 91 F.3d at 1265. Rather, "the FCA is far narrower

[and] requires a false claim." *Id.; see also Harrison v. Westinghouse Savannah River Co.*, 176 F.3d 776, 785 (4th Cir.1999) (holding that because the FCA attaches liability to the claim for payment and not to the underlying fraud, "a central question in False Claims Act cases is whether the defendant ever presented a 'false or fraudulent claim' to the government"); *U.S. v. Rivera*, 55 F.3d 703, 709 (1st Cir.1995) ("[T]he Act attaches liability, not to the underlying fraudulent activity, but to the 'claim for payment.' ").

something more is probably needed to establish liability under the FCA.

That being said, a thoughtful analysis of the law has persuaded me to abandon my initial inclination to grant defendant's motion to dismiss because of the potential existence of sets of facts under which Highmark may, in fact, be liable under the FCA. For instance, the parties' submissions fail to address aspects of the process through which Highmark notifies providers of their refusal to pay a claim, or to pay the claim as secondary payer. If Highmark, for instance, specifically directs the provider to submit the claim to Medicare for payment, or otherwise suggests to the provider that Medicare should be the primary payer, then the United States may have a claim against Highmark under the FCA.[10] For this reason, I will allow the United States to go forward on its claim in Count One of its complaint. It is equally possible, however, that further development of the facts of this case will establish that the United States cannot substantiate the chain of causation necessary to proceed. For instance, if Highmark rejects a claim without any further direction to the provider, it is unclear from the parties'

submissions what options are available to a provider—perhaps the provider will send the claim to Medicare, or, alternatively, perhaps the provider will dispute Highmark's rejection of the claim. These are only possible scenarios surmised by the court, and this court does not imply that other courses of action, or lack thereof, are not possible. Suffice it to say, however, that the more options a provider has when presented with a rejected claim, the less likely the United States will be able to sustain the necessary causal connection between Highmark's rejection of a claim and the provider's presentation of that claim to Medicare.[11]

## B. The False Claims Act—Count II

■ In Count II the United States alleges that Highmark, through its divisions Veritus and HGS, violated the FCA in its public capacity as a Medicare contractor. The United States claims that the public side of Highmark violated Section 3739(a)(1) of the FCA in two ways: (1) Highmark presented false or fraudulent claims for payment against the Medicare Trust Fund by knowingly paying claims

---

**10.** It is also possible that circumstances surrounding the July 1995 settlement, or its negotiation, may allow one to infer the necessary causal relationship.

**11.** There may be an additional hurdle for the government to establish Highmark's liability under Count I. The United States has asserted that "[t]he Court can resolve the motion to dismiss without making a determination as to how CMS (and its contractors) process an MSP claim once Highmark has caused to be presented that fraudulent claim to the Medicare contractor." (U.S. Supp. Br. at 5–6.) While it is true that Highmark's motion to dismiss can be resolved without this information, it should be noted that at least one Circuit has held that "[l]iability under each of the provisions of the False Claims Act is subject to the further, judicially-imposed, requirement that the false statement or claim be material." *Harrison v. Westinghouse Savan-*

*nah River Co.,* 176 F.3d 776, 785 (4th Cir. 1999). In *Harrison,* the Fourth Circuit defined "materiality" as depending upon "whether the false statement has a natural tendency to influence agency action or is capable of influencing agency action." *Harrison,* 176 F.3d 776, 785 (quoting *United States ex rel. Berge v. Bd. of Trustees of Univ. of Ala.,* 104 F.3d 1453, 1459 (4th Cir.1997)). The Third Circuit has not yet decided whether materiality is a required element under the FCA. *Cantekin,* 192 F.3d at 415. If the United States, therefore, can establish that Highmark caused a claim to be presented to Medicare for purposes of satisfying the first element of a prima facie case under the FCA, the United States will then have to argue either: (1) that materiality is not a required element under the FCA; or (2) that the false or fraudulent claim was material.

from the fund as a primary payer in situations in which Highmark, as a private insurer, actually had primary payer responsibility; and (2) Highmark presented false or fraudulent claims by billing CMS for contractual administrative services performed in breach of the parties' contract. (Compl.¶ 76–77.)

As an initial matter, it should be noted that in *United States ex rel. Body v. Blue Cross and Blue Shield of Alabama, Inc.*, 156 F.3d 1098, 1111 (11th Cir.1998), the Eleventh Circuit held, as a matter of first impression, that subsection 1395h(i)(3) of the Social Security Act "gives fiscal intermediaries full immunity from liability for payments that are certified by its certifying officers and issued by its disbursing officers." Subsection 1395h(i) provides:

(1) No individual designated pursuant to an agreement under this section as a certifying officer shall, in the absence of gross negligence or intent to defraud the United States, be liable with respect to any payments certified by him under this section.

(2) No disbursing officer shall, in the absence of gross negligence or intent to defraud the United States, be liable with respect to any payment by him under this section if it was based upon a voucher signed by a certifying officer designated as provided in paragraph (1) of this subsection.

(3) No such agency or organization [such as a fiscal intermediary] shall be liable to the United States for any payments referred to in paragraph (1) or (2).

42 U.S.C. § 1395h(i). The Eleventh Circuit reasoned that the contrast between the limited immunity accorded to certifying and disbursing officers in subsections 1395h(i)(1) and 1395h(i)(2) and the broad, unqualified language of subsection 1395h(i)(3), unambiguously supported their

conclusion that fiscal intermediaries are immune from suit under the Social Security Act. *Body,* 156 F.3d at 1111. Furthermore, the *Body* court asserted that this reading of the subsection was "consistent with the broader goals of section 1395h and the efficient administration of the Medicare system" in light of both the recognition that "[f]iscal intermediaries ... function much like an administrative agency" and the existence of other available remedies for punishing Medicare fraud. *Body,* 156 F.3d at 1112.

Although I find the reasoning of the Eleventh Circuit with regard to Subsection 1395h(i)(3) to be persuasive, subsequent legislation that will not take effect until October 1, 2005, suggests that Congress may have intended otherwise. Medicare Prescription Drug, Improvement, and Modernization Act of 2003 § 911(d), Pub.L. No. 108–173, 117 Stat.2066 (codified at 42 U.S.C. § 1395kk–1 (2003)). Section 911 of the Medicare Prescription Drug, Improvement, and Modernization Act of 2003 amends the Social Security Act as follows:

(d) Limitation on Liability of Medicare Administrative Contractors and Certain Officers.

(1) Certifying officer. No individual designated pursuant to a contract under this section as a certifying officer shall, in the absence of the reckless disregard of the individual's obligations or the intent by that individual to defraud the United States, be liable with respect to any payments certified by the individual under this section.

(2) Disbursing officer. No disbursing officer shall, in the absence of the reckless disregard of the officer's obligations or the intent by that officer to defraud the United States, be liable with respect to any payment by such officer under this section if it was based upon an

authorization (which meets the applicable requirements for such internal controls established by the Comptroller General of the United States) of a certifying officer designated as provided in paragraph (1) of this subsection.

(3) Liability of medicare administrative contractor.

    (A) In general. No medicare administrative contractor shall be liable to the United States for a payment by a certifying or disbursing officer unless, in connection with such payment, the medicare administrative contractor acted with reckless disregard of its obligations under its medicare administrative contract or with intent to defraud the United States.

    (B) Relationship to false claims act. Nothing in this subsection shall be construed to limit liability for conduct that would constitute a violation of sections 3729 through 3731 of title 31, United States Code.

Medicare Prescription Drug, Improvement, and Modernization Act of 2003 § 911(d), Pub.L. No. 108–173, 117 Stat. 2066 (codified at 42 U.S.C. § 1395kk–1 (2003)). In contrast to 42 U.S.C. § 1395h(i), § 911(d)(3)(A) unambiguously states that Medicare contractors are granted the *same* limited liability as certifying and disbursing officers. Congress' insertion of specific qualifying language, in fact the same qualifying language as applies to certifying and disbursing officers, eliminates the ambiguity on which the *Body* decision rests and suggests that Congress does not, in fact, intend Medicare contractors to have full statutory immunity. Furthermore, the discussion on the Senate floor prior to passage of the legislation indicates that the purpose of § 911(d) was to clarify, not change, existing law. 149 Cong. Rec. § 15606 (2003).

The comments of Senator Grassley are informative:

> [T]he language contained in section 911 of the conference agreement clarifies that Medicare administrative contractors are not liable for inadvertent billing errors but, *as in the past,* are liable for all damages resulting from reckless disregard or intent to defraud the United States.... This legislation makes it clear that the False Claims Act continues, *as in the past,* to remain available as a remedy for fraud against Medicare by certifying officers, disbursing officers, and Medicare administrative contractors alike and that, among other things, the remedy subjects Medicare contractors to administrative, as well as trust fund, damages.

*Id.* (emphasis added).

In addition, the statutory immunity recognized by the *Body* court was limited to claims for the recovery of Medicare payments certified and disbursed by the Medicare contractor. The *Body* court specifically recognized that fiscal intermediaries would still be liable for "charges to the government for services the intermediary did not perform." *Body,* 156 F.3d at 1112. Thus, *Body* does not bar the United States' claim that Highmark presented false or fraudulent claims when it billed CMS for contractual administrative services performed in breach of the parties' contract. *See also United States ex rel. Sarasola v. Aetna Life Ins. Co.,* 319 F.3d 1292, 1302 (11th Cir.2003) ("If [the fiscal intermediary] in fact, failed to fulfill its contractual obligation ... then it might be liable to the United States, or a *qui tam* relator, under the False Claims Act for submitting a claim for payment for ... services never rendered."). For these reasons, I deny Highmark's motion to dismiss this count and defer ruling on Highmark's statutory immunity from suit under the

FCA until parties have had the opportunity to thoroughly brief the issue and have oral argument, preferably at the time of summary judgment.

### C. The Remaining Charges—Count III, IV, V, and Relator's Claim

Because I find that the United States has sufficiently stated a claim upon which relief could be granted in Counts III, IV, and V, I also deny Highmark's motion to dismiss these charges. I also find that the relator has sufficiently stated personal claims against Highmark for unlawful retaliation pursuant to 31 U.S.C. § 3730(h) such that she too will be permitted to proceed.

### ORDER

**AND NOW**, this 20th day of February 2004, it is **ORDERED** that defendant's motion to dismiss the government's complaint (previously filed as Docket Entry # 45 in Case # 00–3513) and defendant's motion to dismiss relator's retaliation claim (previously filed as Docket Entry # 46 in Case # 00–3513) are **DENIED**.